FILED
12/22/2016
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 2, 2016

## IN RE: HEAVEN J.

**Direct Appeal from the Juvenile Court for Shelby County**
**No. AA1900     Dan H. Michael, Judge**

___

### No. W2016-00782-COA-R3-PT

___

This appeal involves the termination of a father's parental rights to his daughter. The trial court terminated the father's parental rights upon finding by clear and convincing evidence that several grounds for termination were proven and that termination was in the best interest of the child. We conclude that the record contains insufficient evidence to support the trial court's findings as to grounds for termination. We accordingly reverse and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Constance Andrielle Wooden Alexander, Memphis, Tennessee, for the appellant, Clarence D.

Herbert H. Slattery III, Attorney General and Reporter and Ellison M. Berryhill, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

### OPINION

### I. FACTS & PROCEDURAL HISTORY

Heaven J. was born in March 2014 at a Memphis hospital. She was born at 33 weeks gestational age and tested positive at birth for cocaine and benzodiazepines. The Tennessee Department of Children's Services ("DCS") received a referral that Heaven was a drug exposed infant. Upon investigation, DCS learned that Heaven's mother ("Mother") had a long history of drug abuse and received no prenatal care while

pregnant. No father was listed on Heaven's birth certificate.

On April 1, 2014, DCS filed a petition in the juvenile court of Shelby County seeking an adjudication that Heaven was dependent and neglected and seeking temporary legal custody of her. According to the petition, Heaven weighed three pounds and twelve ounces at birth and remained in the neonatal intensive care unit. The petition alleged that Heaven was ready to be discharged from the hospital, and DCS was not aware of any relatives available to care for her. Mother was previously discharged from the hospital and had not returned to visit Heaven. According to the petition, Mother identified Clarence D. ("Father"), a resident of Kentucky, as Heaven's putative father and reported that he would like to obtain custody of her, but DCS had been unable to contact him.[1] The juvenile court entered an ex parte protective custody order awarding temporary legal custody of Heaven to DCS on or about April 1, 2014. Heaven was placed in a foster home.

DCS conducted two child and family team meetings regarding Heaven on April 14, 2014. Father participated in both meetings by telephone. The record from the first meeting, regarding Heaven's intake, noted that Father was in Kentucky and that he needed to complete a DNA test. The second meeting was held to develop a permanency plan for Heaven. According to the notes from that meeting, Father reported that he wanted to legitimate Heaven as soon as possible. However, DCS also learned that Mother remained legally married to a man who was incarcerated, and therefore, Heaven already had a legal father. The April 14, 2014 permanency plan required Father to provide financial support to Heaven and attend supervised visits with her for four hours per month. It also required Father to legitimate Heaven.

In May 2014, when Heaven was almost two months old, she was removed from her foster home and placed with Mother's cousin in Obion County, Tennessee. Another child and family team meeting was held on August 7, 2014. Father and Mother participated in the meeting via teleconference. Father and Mother indicated their agreement for Heaven to remain with the maternal relatives for the time being. According to the records from the meeting, Mother asked about visitation for Father and his adult children, and the guardian ad litem stated that Father's visitation could not be initiated until he established paternity. Mother informed DCS that a DNA test was scheduled for later that month.[2]

---

[1] Father would later testify that he learned of Heaven's birth a few days after she was born via text message, but he was hospitalized at the time. He testified that he did not know Mother's whereabouts prior to the birth. Mother similarly testified that Father was aware of her pregnancy but that she "ran off" prior to the birth and sent him a message while he was hospitalized.

[2] The meeting records indicate that Father had completed a mental health assessment and would be starting parenting classes in the coming weeks. However, this could have been a misstatement, as this

On August 29, 2014, the juvenile court entered an adjudicatory order in the pending dependency and neglect proceeding. The court found that Heaven was dependent and neglected and the victim of severe child abuse as a result of Mother's use of cocaine while pregnant. Regarding Father, the court further found:

> The child is also dependent and neglected as to [Father]. [Father] has not taken steps to legitimate this child despite knowing of her birth. Further, he and [Mother] have domestic violence issues. [Mother] testified that she and [Father] are no longer romantically involved but as recently as the week before trial she called the police on him because of these issues.

Based on these findings, the court sustained the petition filed by DCS and ordered that Heaven remain in DCS custody.

Another child and family team meeting was held via teleconference on September 4, 2014, in order to revise the permanency plan for five-month-old Heaven. Father participated and reported that he had taken the DNA test on September 2, 2014, and was awaiting the results. Father reported that he would be going to court to file a petition for custody of Heaven. DCS decided to complete an ICPC evaluation for Father, pursuant to the Interstate Compact on the Placement of Children, so that Heaven could be placed with him in Kentucky. In the meantime, however, Heaven would return to her previous foster home, as the maternal relatives reported that they could not continue with the placement in their home as planned.

Another child and family team meeting was held one week later, and Father again participated by phone. Father shared that the DNA test was completed and received, and he indicated his intent to file a petition for custody as the biological father. The meeting summary reflects as a "strength" that Father was working toward regaining custody of Heaven, but it also reflected as a "need" or "concern" that Father would need to present the DNA test result to the court.

A revised permanency plan was also developed during these September meetings. It contained the original requirements for Father to visit Heaven four hours per month, financially support her, and legitimate her. It also added new requirements for Father to comply with the ICPC requirements, provide DCS with an accurate criminal history, remain drug free, and submit to drug screenings.

Father attended a hearing regarding the revised permanency plan on November 3,

appears to be the only mention in the entire record of a mental health assessment and parenting classes. The same document also states, inexplicably, that "[t]he children have been in custody for a year." However, Heaven was only four months old at that time.

2014. He also had a face-to-face visit with Heaven on that date either before or after the hearing for no more than one hour. DCS records indicate that Father informed his case manager that he did not know what he needed to do regarding filing a court petition. Father was instructed to go to a particular office in order to obtain assistance with filing a petition for legitimation.[3] He went to the office as instructed and inquired about the legitimation process. However, he did not complete the filing process on that date because he was told that he needed to submit a $100 filing fee, and he did not have the money that day. Father returned to Memphis on another date and went to the office with the money, but the office was closed.

On November 17, 2014, the juvenile court entered an order ratifying the revised permanency plan and finding that Father was in substantial compliance with its requirements by working to legitimate the child, visiting, and supporting her. Days later, on November 20, 2014, Father was arrested in Kentucky in connection with a domestic altercation with Mother. He was charged with various offenses and remained in jail until March 27, 2015. All charges against Father were ultimately dismissed. Meanwhile, however, while Father was incarcerated, DCS held child and family team meetings in February and March 2015 and discussed Father's incarceration in Kentucky. The team also discussed that Father had not yet legitimated Heaven, who turned one year old in March 2015, despite his stated desire to do so. DCS decided to start the process of terminating Father's parental rights. They also discussed working with Heaven's legal father, Mother's husband, in order to accomplish a surrender of his parental rights.

The juvenile court held a hearing regarding the permanency plan approximately one week after Father was released from jail, on April 6, 2015, and entered an order finding that Father was not in substantial compliance with the plan in that he had not legitimated Heaven, visited, provided financial support, or submitted to random drug tests. Heaven was assigned a new case manager in May 2015, but she admittedly did nothing to assist Father with the permanency plans because the decision had already been made to terminate his parental rights. Father attended a foster care review board hearing on June 23, 2015, and had a short face-to-face visit with Heaven that day. Father also passed a drug screen that day.

On July 30, 2015, four months and three days after Father was released from jail, DCS filed a petition to terminate his parental rights. Heaven was sixteen months old. The petition alleged numerous grounds for termination, including abandonment by willful failure to visit and willful failure to support; substantial noncompliance with a permanency plan; persistent conditions; and numerous additional grounds applicable to

---

[3]Although Father never confirmed the name of this office, the guardian ad litem during her questioning referenced "the center for noncustodial parents."

4

non-legal fathers.[4]  Father filed a petition to establish parentage on January 27, 2016. The termination trial was held on February 11, 2016, before a special judge.  The special judge heard testimony from Father, Mother, Mother's mother, three DCS employees, and Heaven's foster mother.  On March 10, 2016, the special judge entered an order terminating Father's parental rights based on all grounds asserted in the petition.  Father timely filed a notice of appeal.

## II. ISSUES PRESENTED

On appeal, Father raises a single issue regarding whether the trial court erred in allowing questions to be asked of him and Mother regarding his prior crimes, wrongs, or acts, specifically in connection with his arrest for the domestic incident, in violation of Tennessee Rule of Evidence 404(b).[5]  Father does not challenge the trial court's findings regarding the various grounds for termination or the best interest analysis.  However, the Tennessee Supreme Court has stated unequivocally that "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal."  *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016).  As a result, we have reviewed the trial court's findings regarding all grounds for termination and regarding the best interest analysis.  For the following reasons, we reverse and remand for further proceedings.

## III. STANDARD OF REVIEW

"In Tennessee, proceedings to terminate a parent's parental rights are governed by statute."  *In re Kaliyah S.*, 455 S.W.3d 533, 541 (Tenn. 2015).  Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent."  *Id.* at 546.  Pursuant to the statute, parties who have standing to seek termination of a biological parent's parental rights must prove two elements.  *Id.* at 552.  First, they must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated section 36-1-113(g).  *Id.* Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i).  *Id.*  In light of the constitutional dimension of the rights at stake in a

---

[4]The petition also alternatively alleged abandonment by an incarcerated parent due to some confusion as to the dates of Father's incarceration, but DCS later withdrew this ground for termination.  The ground of persistent conditions was not alleged in the original petition but was added via an amended petition.
[5]This Court entered an order directing Father to also address in his brief whether the special judge was validly appointed to hear this matter, and if not, whether the invalid appointment had any effect on the validity of the judgment appealed.  Having reviewed the parties' briefs on this matter, we are satisfied that the order is valid despite the deficiencies we perceive in the appointment process.

termination proceeding, the persons seeking to terminate parental rights must prove both of these elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). "Clear and convincing evidence" has been defined as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (citing *In re Valentine*, 79 S.W.3d at 546). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

Because of this heightened burden of proof in parental termination cases, on appeal we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). First, we review each of the trial court's specific factual findings *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *In re Adoption of Angela E.*, 402 S.W.3d at 639. Second, we must make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review *de novo* with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. Grounds for Termination

#### 1. Abandonment

The first ground for termination listed in the termination statute is abandonment. *See* Tenn. Code Ann. § 36-1-113(g)(1). For purposes of terminating parental rights, there are five alternative definitions of abandonment. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i)-(v). According to the first definition, which is allegedly applicable in this case, "abandonment" means:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the

subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i). "Abandonment can be established by showing that a parent *either* willfully failed to visit *or* willfully failed to support the child during the relevant time period." *In re Christopher M.*, No. W2010-01410-COA-R3-PT, 2010 WL 4273822, at *10 (Tenn. Ct. App. Nov. 1, 2010) (citing *In re Adoption of McCrone*, No. W2001-02795-COA-R3-CV, 2003 WL 21729434, at *10 (Tenn. Ct. App. July 21, 2003)).

The element of willfulness is essential and central to a determination of abandonment. *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005); *In re C.M.C.*, No. E2005-00328-COA-R3-PT, 2005 WL 1827855, at *6 (Tenn. Ct. App. Aug. 3, 2005). It "is both a statutory and a constitutional requirement." *In re Adoption of Kleshinski*, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *18 (Tenn. Ct. App. May 4, 2005). A parent's conduct must have been willful in the sense that it consisted of intentional or voluntary conduct. *In re Audrey S.*, 182 S.W.3d at 863. "To prove the ground of abandonment, a petitioner must establish by clear and convincing evidence that a parent who failed to visit or support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Audrey S.*, 182 S.W.3d at 864). "Whether a parent failed to visit or support a child is a question of fact[; however,] whether a parent's failure to visit or support constitutes willful abandonment is a question of law." *Id.* (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810).

## 1. Willful Failure to Visit

Because the termination petition was filed on July 30, 2015, we look to the four-month period immediately preceding that date, spanning from March 30 to July 29, 2015, in order to determine whether Father willfully failed to visit Heaven during that timeframe. *See In re Jacob C. H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (explaining the calculation of the four-month period). As noted above, Father was released from jail on March 27. Father saw Heaven only once during the relevant four-month time period, at a foster care review board hearing in June, when he was permitted to visit for roughly one hour. Heaven's foster mother testified that Father also contacted her directly sometime around May 2015 and asked to visit Heaven, but she told him to direct his request to DCS.

Father's initial permanency plan, dated April 14, 2014, and all subsequent plans,

required him to visit for a minimum of four hours per month. At trial, Father acknowledged that visitation was discussed during the meetings, which also included Mother, but he testified that he was told that *he* did not have any right to visit because someone else was designated as Heaven's legal father. DCS records confirm that Father's case manager told him that "he did not have the same visitation rights as [Mother]" until he legitimated Heaven. The April 14, 2014 summary from the initial child and family team meeting addressed "Visitation plans for the next three months" for "Parent/Child visits," and it listed only "Supervised Visitation for Mother" with no mention of visits for Father. An affidavit of the case manager from April 23, 2014, states, "The following visitations were arranged by the state: . . . No Visitation. [Father] currently resides in Fulton Kentucky." And, as noted above, during the August 7, 2014 meeting, the guardian ad litem stated that "[Father's] visitation cannot be initiated until paternity is established."[6] Father testified at trial that he received no assistance with visitation. He testified that he called to set up visitation, but when he came "down here," he was told that he could not visit because Mother was still married and he had not legitimated Heaven. Father testified that he would have had no problem traveling to Memphis to visit, but he could not get visits arranged with the same people who were telling him that he had no rights.

"A parent cannot be said to have abandoned a child when his failure to visit [ ] is due to circumstances outside his control." *In re Adoption of Angela E.*, 402 S.W.3d at 640. The Tennessee Supreme Court has recognized that "when a parent attempts to visit his child but is 'thwarted by the acts of others,' the failure to visit is not willful." *In re M.L.P.*, 281 S.W.3d at 392 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). "A parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *Id.* at 393 (citing *In re Audrey S.*, 182 S.W.3d at 864). "[A] parent's failure to visit is deemed willful when it is the product of free will, rather than coercion." *Id.* at 392.

We note that Father took no action to legitimate Heaven during the four-month period after he was released from jail. Presumably, if Father had legitimated Heaven, he would have been permitted to visit. When analyzing willfulness, courts have considered whether a parent who was allegedly denied visitation redirected their efforts to the courts in an attempt to secure visitation. *See, e.g.*, *In re Adoption of Angela E.*, 402 S.W.3d at 642 (finding willful failure to visit where the father "had no reasonable excuse" for failing to pursue a petition to reinstate his visitation); *In re M.L.P.*, 281 S.W.3d at 393 (finding willful failure to visit when the father took no legal action against the guardian

---

[6]We note that the trial court's order contains a general statement that the court found Father "not credible." However, DCS's own records and witnesses confirmed the statements that were made to Father by the case manager and the guardian ad litem regarding his lack of visitation rights.

8

of the child in order to obtain custody and "had no good reason for his failure to do so"); *In re Adoption of A.M.H.*, 215 S.W.3d at 810 (declining to find willful failure to visit when the parents were actively pursuing legal proceedings to regain custody).

Here, Father had taken the DNA test in September 2014 and visited the Memphis office twice in early November 2014 in an effort to legitimate Heaven. He was incarcerated from November 20, 2014, until March 27, 2015, and the four-month period spans from March 30 to July 29, 2015. Father had been told by DCS that he would need to retain an attorney in order to file a petition and "get paternity legally transferred" to him due to the fact that Heaven already had a legal father. Father testified that he contacted "legal aid" in Kentucky in order to see if he would qualify for assistance. Apparently he did not, as Father also visited a private attorney's office in Weakley County, Tennessee. The attorney told Father that the process would be expensive, and Father testified that he did not have the money to retain the attorney. It is not clear from the record whether Father sought legal aid and consulted with the attorney before or after his period of incarceration. In either event, however, we conclude that Father, upon his release, faced a significant restraint or barrier that prevented him from visiting Heaven during the four months after he was released from jail.[7]

Considering the statements made to Father by his case manager and the guardian ad litem regarding his visitation, in addition to the requirement that he retain an attorney, the evidence does not clearly and convincingly demonstrate that Father had the capacity to visit Heaven, made no attempt to do so, or had no justifiable excuse for not doing so. *See In re Adoption of Angela E.*, 402 S.W.3d at 640. Despite the statements made by the case manager and guardian ad litem, Father contacted the foster mother directly, within the relevant four-month timeframe, and asked to visit Heaven, but to no avail. Father did

---

[7]In the termination order, the special judge found that "[the foster mother] testified that she recalls the magistrate asking [Father] if he wanted to be appointed an attorney to represent him, and [Father] stated he 'didn't feel like he needed one.'" Respectfully, the foster mother did not testify that the magistrate asked Father if he wanted to be *appointed* an attorney. She testified that she attended the November 3, 2014 permanency plan hearing regarding the steps that Father needed to follow, and "[Father] was asked about legal representation and [] he was under the impression that he really didn't need it and he would do it himself, that he really didn't need it, a lawyer, but then the Judge said that it would be best if he got one." Father testified that he was never "offered" an attorney except the one that was appointed during the termination trial. The foster mother confirmed Father's testimony on cross-examination, as she was asked:

> Q. The November 3rd court hearing that [DCS's attorney] just questioned you about, was an attorney offered for [Father], to your knowledge?
> A. No, ma'am.
> Q. None was offered?
> A. No, ma'am.

travel from Kentucky to visit with Heaven during the one opportunity he was afforded at the foster care review board hearing in June. We therefore conclude that DCS failed to prove by clear and convincing evidence that Father willfully failed to visit Heaven and reverse the trial court's finding that this ground was sufficiently proven.

## 2. Willful Failure to Support

We must examine the same four-month period from March 30 to July 29, 2015, in order to determine whether Father willfully failed to support Heaven during that timeframe. At trial, Father testified that he bought "Pampers and stuff like that when [Heaven] was little," but he conceded that he had not formally paid child support. Father testified that he would have purchased more items, but he did not know where to send them. He testified that he informed DCS that he would pay child support, and he claimed that he called his case manager and asked where to send child support payments but was given no assistance. Mother testified that Father sent money directly to her in order to buy things for Heaven when she was still in the hospital after birth. However, Father provided no support during the pivotal four-month period.

Again, the element of willfulness is central to our analysis. Defining abandonment as the mere non-payment of support, irrespective of intent, would be unconstitutional. *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). The relevant statutes define the concept of *willful* failure to support or to make reasonable payments toward support as the *willful* failure to provide monetary support or "more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is support that "under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). By its terms, the definition of token support requires consideration of the circumstances of the individual case. *In re K.C.*, No. M2005-00633-COA-R3-PT, 2005 WL 2453877, at *9 (Tenn. Ct. App. Oct. 4, 2005) (citing Tenn. Code Ann. § 36-1-102(1)(B)). A finding that support was "insignificant" in light of the parent's "means" cannot be made without evidence regarding *both* a parent's actual financial support of the child and a parent's "means." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *11 (Tenn. Ct. App. June 3, 2003). "In the context of token support, the word 'means' connotes both income and available resources for the payment of debt." *In re Adoption of Angela E.*, 402 S.W.3d at 641 (citing *In re Z.J.S.*, 2003 WL 21266854, at *11 n.24; *Black's Law Dictionary* 1070 (9th ed. 2009)).

The Tennessee Supreme Court's decision in *In re Adoption of Angela E.*, 402 S.W.3d at 641, is instructive. In that case, the Tennessee Supreme Court found that the petitioners failed to provide clear and convincing evidence of willful failure to support when there was no evidence presented concerning the defendant-father's monthly

expenses, even though it was undisputed that he was a physician earning an annual income of $150,000 and owned lien-free property worth at least $300,000. *Id.* The Tennessee Supreme Court found the evidence regarding the father's income and expenses "limited at best" and deemed the evidence insufficient. *Id.* The court reiterated that, in order to prove the ground of abandonment for failure to support, "[a] party seeking termination of parental rights must prove by clear and convincing evidence that the [parent who failed to support] had the capacity to pay support but made no attempt to do so and did not possess a justifiable excuse." *Id.* Thus, *In re Adoption of Angela E.* illustrates "the significance of evidence concerning a parent's income and expenses when the ground of abandonment by willful failure to support is alleged." *In re Navada N.*, 498 S.W.3d 579, 594 (Tenn. Ct. App. 2016). "[A] court can only determine willfulness of a parent's failure to support where there is sufficient evidence regarding the parent's ability to pay." *In re Jamie G.*, No. M2014-01310-COA-R3-PT, 2015 WL 3456437, at *15 (Tenn. Ct. App. May 29, 2015), *perm. app. denied* (Tenn. Aug. 28, 2015).

At trial, Father testified that he was "currently" residing with his mother and brother and contributing $100 toward the monthly rent in addition to household expenses. His mother provided groceries for the household with food stamps. Father testified that at the time of trial he was working forty hours a week at a factory assembling lawnmowers and earning $9.80 an hour. He testified to the amount of his monthly bills. Significantly, however, Father was not asked about his income or expenses *during the relevant four-month period*. The fact that Father was employed at the time of trial in February 2016 does not clearly and convincingly prove that Father had the capacity to pay child support during the relevant four-month timeframe between March 30 and July 29, 2015. Notably, Father was released from jail only three days prior to the beginning of the four-month period, on March 27, 2015. It is unclear when Father began working after his release or where he lived at that time. Heaven's current case manager testified that she had no knowledge about Father's employment aside from the testimony Father gave at trial. Simply put, the record contains no evidence regarding Father's income, ability to work, or expenses during the relevant timeframe. This is a critical gap in the evidence that we cannot overlook. "Without such evidence, a finding of willfulness cannot be sustained." *In re Navada N.*, 498 S.W.3d at 600. The burden to prove Father's abandonment by willful failure to support rested squarely on DCS as the petitioner. We do not fault Father for the absence of evidence regarding his financial situation. In a termination proceeding, the burden is not on a parent to demonstrate an inability to pay; the burden is on the petitioner to prove by clear and convincing evidence that the parent had the capacity to pay, made no attempt to do so, and had no justifiable excuse for not doing so. *In re Adoption of Angela E.*, 402 S.W.3d at 641. It is not enough for a petitioner to "simply prove that [the parent] was not disabled during the relevant timeframe" and therefore assume that he or she was capable of working and paying child

support.  *In re Josephine E.M.C.*, No. E2013-02040-COA-R3-PT, 2014 WL 1515485 at *18 (Tenn. Ct. App. Apr. 17, 2014), *perm. app. denied* (Tenn. July 23, 2014).  Without basic information regarding Father's means, we are unable to determine, by clear and convincing evidence, whether Father had the capacity to provide support or lacked a justifiable excuse for failing to do so.  We therefore conclude that DCS failed to prove willful failure to support by clear and convincing evidence and reverse the trial court's finding on this ground for termination.

### B.    *Substantial Noncompliance*

The next ground for termination asserted by DCS and found by the trial court was substantial noncompliance.  This ground is found in Tennessee Code Annotated section 36-1-113(g)(2) and applies when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4."  Tenn. Code Ann. § 36-1-113(g)(2).  As clearly stated in the statute, in order for a parent's "noncompliance to justify the termination of parental rights, it must be 'substantial.'"  *In re Angel S.F.*, No. M2012-02089-COA-R3-PT, 2013 WL 1136551, at *5 (Tenn. Ct. App. Mar. 18, 2013); *see In re Valentine*, 79 S.W.3d at 548 ("noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial").  Terminating parental rights based on this ground "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan."  *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004).  The petitioner must demonstrate that the parent's noncompliance is substantial considering "the degree of noncompliance and the importance of the particular requirement that has not been met."  *Id.*  "'Substantial'" means "'of real worth and importance.'"  *In re Valentine*, 79 S.W.3d at 548 (quoting *Black's Law Dictionary* 1428 (6th ed. 1990)).  "Determining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed and 'going through the motions' does not constitute substantial compliance."  *In re Carrington H.*, 483 S.W.3d at 537.  As we have noted,

> [T]he requirements of the permanency plan are intended to address the problems that led to removal; they are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care. This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children.

*In re Derrick J.*, No. E2015-01507-COA-R3-PT, 2016 WL 3752013, at *11 (Tenn. Ct.

12

App. July 8, 2016) (*no perm. app. filed*) (quoting *In re C.S., Jr.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at \*10 (Tenn. Ct. App. Sept. 14, 2006)). A parent's improvement toward compliance should be considered in a parent's favor. *In re Valentine*, 79 S.W.3d at 549 (considering the parent's efforts in the year prior to the hearing). Determining whether substantial noncompliance exists is a question of law that we review *de novo* with no presumption of correctness. *In re Tamera W.*, No. W2015-01988-COA-R3-PT, 2016 WL 6610359, at \*5 (Tenn. Ct. App. Nov. 9, 2016).

In conjunction with the determination of substantial noncompliance, the trial court must find that the requirements of the permanency plan are "reasonable and are related to remedying the conditions that necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C). "Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547.

The April 14, 2014 permanency plan required Father to provide financial support to Heaven, to attend supervised visits with her for four hours per month, and to legitimate Heaven. The September 17, 2014 revised plan added requirements for Father to comply with any ICPC requirements, provide DCS with an accurate criminal history, remain drug free, and submit to drug screenings. These requirements were reasonable and related to remedying the conditions necessitating foster placement.[8]

Next, we must determine whether Father's noncompliance with the requirements was substantial. The special judge found that Father "failed to comply with *any* of the tasks on the plan." (Emphasis added.) We disagree with this conclusion. However, we also note that when considering this ground for termination, "[o]ur focus is on the parent's *efforts* to comply with the plan, not the achievement of the plan's desired outcomes." *In re Aiden R.*, No. E2015-01799-COA-R3-PT, 2016 WL 3564313, at \*9 (Tenn. Ct. App. June 23, 2016) (*no perm. app. filed*) (citing *In re B.D.,* No. M2008-01174-COA-R3-PT, 2009 WL 528922, at \*8 (Tenn. Ct. App. Mar. 2, 2009), *perm. app. denied* (Tenn. May 18, 2009)) (emphasis added). In other words, "outcome achievement is not the measure of compliance." *In re B.D.*, 2009 WL 528922, at \*8. "The parent's efforts to accomplish his or her responsibilities under the permanency plan must factor into the court's consideration." *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at \*18 (Tenn. Ct. App. Sept. 14, 2012). While we recognize that by the

---

[8]Inexplicably, the permanency plans also listed Father as a party responsible for ensuring that Heaven attended certain screenings and medical appointments. This requirement was clearly unreasonable given the circumstances of this case. We will not discuss it further for purposes of this opinion. Permanency plan terms that are not reasonable are irrelevant, and "substantial noncompliance with such terms is irrelevant." *In re Valentine*, 79 S.W.3d at 548-49.

time of trial in February 2016, Father still had not fully completed some requirements of his permanency plans, we must examine Father's *efforts* to comply. *See, e.g.*, *In re Jason S.*, No. M2016-00226-COA-R3-PT, 2016 WL 5385854, at *7 (Tenn. Ct. App. Sept. 23, 2016) (*no perm. app. filed*) (considering the parent's efforts to comply with a requirement even though the particular action taken may not have technically fulfilled the requirement).

The first requirement of the permanency plan was for Father to visit Heaven for four hours per month. Father testified that he only visited with Heaven during her placement with Mother's cousin when Heaven was very young and when he came to Memphis for court hearings or meetings. Thus, Father did not visit with Heaven for four hours in any month. As we have previously discussed, however, it is not clear from the record that he was actually allowed to do so. According to DCS records, the guardian ad litem was asked during a meeting about visitation for Father and his adult children, and she stated that Father's visitation could not be "initiated" until his paternity was established. DCS records confirm that Father was told by his case manager that he did not have the same visitation rights as Mother. Still, Father traveled to Tennessee for court hearings and visited with Heaven at those times when permitted, and he also contacted the foster parent directly in an attempt to visit Heaven, but he was denied. Father made efforts to comply with the visitation requirement but was apparently not allowed to visit. We cannot fault him for failing to meet the visitation requirement of the permanency plan under the circumstances of this case.

Father failed to provide financial support for Heaven as required by the plans. However, our ability to assess Father's efforts is hindered by the fact that we do not know anything about Father's income or expenses except at the time of trial in February 2016. DCS records reflect that Father was employed at a factory when Heaven entered custody in April 2014, and yet he did not provide financial support to her aside from the money and diapers he sent when Heaven was very young. Father testified that he did not know where to send financial support, but he also admitted that he knew the foster parents' telephone number. We must also note, however, that Father was incarcerated in Kentucky from November 2014 until March 2015. We are cognizant of the reality that Father would have had limited means of securing stable income while incarcerated. *See In re M.B.R.*, No. E2015-01906-COA-R3-PT, 2016 WL 3568183, at *5 (Tenn. Ct. App. June 23, 2016) (*no perm. app. filed*). "'An incarcerated parent is not absolved of his or her parental responsibilities while in jail or prison. However, incarceration is a relevant consideration when judging that parent's ability to fulfill his or her responsibilities to the child.'" *In re Aiden R.*, 2016 WL 3564313, at *9 (quoting *In re Jonathan F.*, No. E2014-01181-COA-R3-PT, 2015 WL 739638, at *13 (Tenn. Ct. App. Feb. 20, 2015) (*no perm. app. filed*)); *see, e.g.*, *In re M.B.R.*, 2016 WL 3568183, at *5 (declining to find substantial

14

noncompliance "given the fact that [the parent's] incarceration inherently restricted his access to the means to address some of his requirements"). "Clearly in most situations an incarcerated parent is going to be unable to complete at least some significant portion of the permanency plan." *In re Jonathan F.*, 2015 WL 739638, at \*13.

The revised permanency plan also required Father to remain drug-free and submit to drug screenings. Father was administered one drug screen, and he tested negative. Although a DCS representative vaguely suggested at trial that Father was "not available" for additional drug screens as he resided in Kentucky, the record contains no testimony that Father was asked to take additional drug screens and refused. Father testified that DCS never set up any plan for him to take drug screens in Kentucky, and Father said he never told anyone that he would not participate in drug screening. Also, the record contains no evidence that Father failed any drug screens administered by another source or failed to remain drug-free. Father testified that he was required to take drug screens for his job "all the time." In sustaining this ground for termination, the special judge found that Father failed to "provide proof of drug screens" he had completed elsewhere to DCS, but this was not a requirement of his permanency plans, and there is no indication that Father was otherwise instructed to do so. The permanency plans only provided that Father would "remain drug free and [] submit to drug screenings." We conclude that Father complied with this requirement.

The revised permanency plan also provided that DCS would complete an ICPC for Father, and Father would comply with any requirements of the ICPC process. DCS representatives testified that they submitted the necessary paperwork for the ICPC study in Kentucky, and it was halted because of Father's background check. The record contains no testimony that Father failed to do anything that was asked of him with regard to the ICPC process. Accordingly, we see no evidence that Father failed to comply with this requirement.

The September 17, 2014 revised plan also added a separate requirement for Father to provide DCS with an accurate criminal history. The only testimony about this requirement came from Heaven's latest case manager, who assumed responsibility for Heaven's case in May 2015. She was asked if Father ever provided *her* with any information regarding his criminal history and responded "no." However, this evidence does not necessarily prove that Father failed to comply with the requirement. The record contains no testimony about whether the information was provided to anyone else prior to this case manager's involvement. In addition, DCS never explained why this particular requirement was added to the revised plan or why this requirement was important under the circumstances. Due to this lack of evidence, we assign little weight to Father's possible noncompliance with this requirement.

Perhaps the most important requirement of the permanency plan was the requirement for Father to legitimate Heaven. To recap, Father took the necessary DNA test on September 2, 2014, and he informed DCS of the results during a child and family team meeting. In November 2014, Father was told "where to go" to seek assistance regarding legitimation. Father visited the office in Memphis as instructed and inquired about filing a petition. He testified that he did not complete the process on that date because he was told that he would be required to pay $100 and did not have the money that day.[9] Father testified that he returned to Memphis on another date and went to the office with the filing fee, but the office was closed. Mother testified that she accompanied Father to the office on that date, and she confirmed that it was closed due to Election Day. Father was arrested soon after these events, later in November 2014, and he remained incarcerated until March 2015.

DCS also informed Father that he needed to retain an attorney to file a petition and "get paternity legally transferred" to him because Heaven already had a legal father. Father testified that he contacted "legal aid" in Kentucky and visited an attorney's office in Weakley County, Tennessee, but he did not have the money to retain the attorney. The termination proceeding was filed four months after Father was released from incarceration, in July 2015, and Father was appointed an attorney in November 2015. Also during November 2015, Father visited another office in Memphis, "the Maximus Child Support office on Mendenhall," and inquired about legitimating Heaven. He was told that he would have to take another DNA test and did submit to a second DNA test on that date. Father testified that he had not received the results of this test at the time of trial, and the child support office had taken no further action. Father filed a petition to establish parentage in January 2016, just two weeks before the termination trial in February 2016. Overall, this evidence demonstrates that Father had not fully completed the legitimation requirement by the time of trial in February 2016, but he made considerable efforts and substantial progress toward doing so.

In sum, Father failed to pay financial support and may have failed to provide information regarding his criminal history, but he made efforts to legitimate Heaven, complied with the drug testing requirement, remained drug free, stayed in compliance regarding the ICPC process, and made efforts to visit although he was not ultimately

---

[9] The special judge found that Father "chose not to pay" the $100 filing fee and "had the ability to pay the $100 filing fee since he is working 40 hours a week and making $9.80 an hour." However, as discussed above, Father's testimony about his wages was limited to his employment at the time of trial in February 2016. Father visited the office prior to his incarceration, in November 2014. The record contains no evidence regarding the amount of Father's income and expenses at that time in order to support a determination of ability to pay. The special judge alternatively found that Father could have filed an affidavit of indigence in order to avoid paying the filing fee, but there is no evidence to suggest that Father was made aware of this option if in fact it was available to him at that time.

permitted to do so. Father failed to accomplish some requirements of the permanency plans, but we recognize his efforts at compliance and his limitations due to his period of incarceration, his residence in Kentucky, his financial situation, and the decisions made by DCS regarding visitation. "Clear and convincing evidence" eliminates any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Adoption of Angela E.*, 402 S.W.3d at 640. We conclude that the evidence in this case does not rise to that level. *See, e.g.*, *In re Analilia R.*, No. E2015-00479-COA-R3-PT, 2015 WL 7567090, at *10 (Tenn. Ct. App. Nov. 24, 2015), *perm. app. denied* (Tenn. Feb. 22, 2016) (finding no clear and convincing evidence of substantial noncompliance where the father faced various barriers and "at least sincerely attempted to meet his responsibilities" even though he never completed an alcohol and drug assessment, domestic violence counseling, anger management counseling, or family counseling as required). Overall, the evidence does not clearly and convincingly establish that Father's noncompliance with the permanency plans was substantial. We therefore reverse the trial court's finding that this ground for termination was proven by clear and convincing evidence.

### C.    Persistent Conditions

The next ground asserted by DCS and found by the trial court was persistent conditions. The statutory ground for termination that is commonly referred to as "persistent conditions" is defined in Tennessee Code Annotated section 36-1-113(g)(3) as existing when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> > (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
> >
> > (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
> >
> > (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

As the statute indicates, for this ground to apply, the child must "ha[ve] been removed from the home of the parent or guardian by order of a court for a period of six (6) months." Tenn. Code Ann. § 36-1-113(g)(3).

We begin by examining whether Heaven was removed from Father's home under circumstances that render this ground for termination applicable. "An essential prerequisite to establishing persistence of conditions is evidence of a 'prior court order removing the child from the parent's home . . . based on a judicial finding of dependency, neglect or abuse.'"[10] *In re Aiden R.*, 2016 WL 3564313, at *9 (quoting *In re Audrey S.*, 182 S.W.3d at 874); *see also In re Alleyanna C.*, No. E2014-02343-COA-R3-PT, 2015 WL 4773313, at *14 (Tenn. Ct. App. Aug. 10, 2015) (*no perm. app. filed*) (describing the presence of the necessary court order of removal as the "threshold consideration for this statutory ground"); *In re Makenzie L.*, No. M2014-01081-COA-R3-PT, 2015 WL 3793788, at *12 (Tenn. Ct. App. June 17, 2015), *perm. app. denied* (Tenn. Oct. 15, 2015) (considering the sufficiency of the removal order as a threshold matter for the ground of persistent conditions).

Here, the juvenile court entered an order on August 29, 2014, when Heaven was five months old, adjudicating her dependent and neglected. In sustaining this ground for termination, the special judge found that Heaven "has been in the custody of the State of Tennessee, Department of Children's Services for more than six (6) months," but that is not what the statute requires. The persistent conditions ground applies only where there was a "prior court order *removing the child from the parent's home*" based on a judicial finding of dependency, neglect, or abuse. *In re Audrey S.*, 182 S.W.3d at 874 (emphasis added). "Removal of the child from the parent's home is a threshold requirement for applicability of the persistence of conditions ground." *In re Mickia J.*, No. E2016-00046-COA-R3-PT, 2016 WL 5210794, at *1 (Tenn. Ct. App. Sept. 19, 2016) (*no perm. app filed*). The August 29, 2014 order adjudicating the dependency and neglect petition did not remove Heaven from Father's home or his custody. Heaven never resided in Father's home, and he never had custody of her. A removal from Mother's home does not provide a basis for terminating Father's parental rights on the ground of persistent conditions. *See In re Hailey S.*, No. M2015-00842-COA-R3-PT, 2016 WL 3209444, at *12 (Tenn. Ct. App. May 31, 2016) (*perm. app. pending*) (explaining that application of the

---

[10]In *In re Audrey S.*, 182 S.W.3d at 872, this Court explained that the particular language used by the termination statute limits the scope of this ground for termination. The termination statute references the original "conditions that led to the child's removal" and "other conditions that in all reasonable probability would cause the child to be subjected to *further* abuse and neglect." Tenn. Code Ann. § 36-1-113(g)(3) (emphasis added). Consequently, "this ground for termination applies 'only where the prior court order of removal was based on a judicial finding of abuse or neglect.'" *In re Alysia S.*, 460 S.W.3d 536, 574 (Tenn. Ct. App. 2014) (quoting *In re Audrey S.*, 182 S.W.3d at 872).

persistent conditions ground is generally prohibited when the child was not removed from that parent's home, pursuant to the plain meaning of the statute); *In re Destaney D.*, No. E2014-01651-COA-R3-PT, 2015 WL 3876761, at *5 (Tenn. Ct. App. June 23, 2015) (*no perm. app. filed*) ("The legal deficiency concerning the trial court's determination regarding this ground for termination lies in the fact that the Children were not removed from Father's home."); *In Re Jayden B.T.*, No. E2014-00715-COA-R3-PT, 2015 WL 3876573, at *10 (Tenn. Ct. App. June 23, 2015), *perm. app. denied* (Tenn. Sept. 25, 2015) ("the ground of persistence of conditions leading to the removal of the child is not applicable when the child was not removed from the home of the parent whose rights are at issue"); *In re K.M.K.*, No. E2014-00471-COA-R3-PT, 2015 WL 866730, at *7 (Tenn. Ct. App. Feb. 27, 2015) (*no perm. app. filed*) (finding the ground of persistent conditions inapplicable when the children were not removed from that parent's home); *In re Jonathan F.*, 2015 WL 739638, at *14 ("In our understanding of this ground for termination, the Child must be removed from the home of the parent whose rights are sought to be terminated under the ground."); *In re Maria B.S.*, No. E2012-01295-COA-R3-PT, 2013 WL 1304616, at *11 (Tenn. Ct. App. Apr. 1, 2013) ("No one removed the Children from Father -- he never had the Children in the first place. There is case precedent to support Father's position that, without removal from that parent's home, the ground of persistent conditions is inapplicable.").[11]

---

[11]We note one recent case in which this Court rejected a father's argument that the "persistent conditions" ground was inapplicable by challenging the prior order of removal. In *In re Steven C.*, No. M2014-01944-COA-R3-PT, 2015 WL 11112551, at *2 (Tenn. Ct. App. June 15, 2015), *perm. app. denied* (Tenn. Sept. 9, 2015), an unwed father argued that removal of his son through a dependency and neglect order was insufficient because the father lived alone at the time of the order, and, he claimed, the child was not "removed" from his home. Without discussing the cases cited above or any other authority, this Court rejected the Father's argument, stating:

> There is no reasonable construction of the statute to suggest a requirement that the child be physically present in the home of the parent whose rights are being terminated when the child comes into DCS custody in order for the ground of persistence of conditions to be established; in the clear interpretation and application of the statute, the operative determination is that the child has been removed from the custody of the parents due to certain conditions. This plain sense interpretation of the statute is shown in the circumstances of this case, where Steven was three weeks old when he came into the custody of DCS as a result of his mother leaving the rehabilitation program she had agreed to attend and his father – by his own testimony – being in circumstances which rendered him unable to care for him.
> Steven was removed from the custody of both parents due to dependency and neglect[.]

*Id.* at *4-5. In the case before us, however, the distinction is immaterial as the record does not contain any order removing Heaven from Father's home or custody based on a judicial finding of dependency, neglect, or abuse.

"[A]s a threshold requirement for applicability of the ground of persistence of conditions in termination of parental rights cases, the child must not only have been adjudicated dependent and neglected, but he or she must also have been removed from the defendant parent's home." *In re Mickia J.*, 2016 WL 5210794, at *5. As it is, the record contains no evidence that Heaven was removed from Father's home or custody. Consequently, the ground of persistent conditions cannot serve as a basis for terminating his parental rights, and we reverse the trial court's finding to the contrary.

### D.   Other Grounds

The trial court also terminated Father's parental rights based on several subsections found in Tennessee Code Annotated section 36-1-113(g)(9). According to our supreme court, "The grounds for termination in Tenn. Code Ann. § 36-1-113(g)(9) cannot be used to terminate the rights of a person who is a child's biological parent, legal parent, or putative biological father at the time the termination petition is filed." *In re Bernard T.*, 319 S.W.3d 586, 599 (Tenn. 2010) (citing *In re D.A.H.*, 142 S.W.3d 267, 272-73 (Tenn. 2004)). On appeal, DCS concedes that the grounds in subsection (g)(9) were not applicable to Father pursuant to the supreme court's holding in *Bernard*. We agree and reverse the termination based on the grounds in subsection (g)(9).[12] *See, e.g.*, *In re Mac L.*, 2016 WL 6876498, at *8.

### V. CONCLUSION

All other issues raised on appeal are pretermitted. The decision of the juvenile court is hereby reversed and remanded for further proceedings. Costs of this appeal are taxed to the appellee, the Tennessee Department of Children's Services.

_____
BRANDON O. GIBSON, JUDGE

---

[12]Subsection (g)(9) was amended after the decision in *Bernard* and the termination proceedings in the trial court. However, the amendment is inapplicable to this case.